# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| RUTH WILLIAMS, TOVAH ALLEN, CAROLYN ROSS, ALICIA BATES and TRACY YOUNG, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| CENTENE CORPORATION, THE BOARD OF DIRECTORS OF THE CENTENE CORPORATION, THE CENTENE CORPORATION RETIREMENT PLAN INVESTMENT COMMITTEEE and JOHN DOES 1-30. | )<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO.: 4:22-cv-00216

Defendants.

## FIRST AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, Ruth Williams, Tovah Allen, Carolyn Ross, Alicia Bates and Tracy Young, ("Plaintiffs"), by and through their attorneys, on behalf of the Centene Management Corporation Retirement Plan (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Centene Corporation ("Centene" or "Company") and the Board

---

[1]  Plaintiffs file this Amended Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

[2]  The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

of Directors of Centene Corporation and its members during the Class Period ("Board")[3] and the Centene Corporation Retirement Plan Investment Committee and its members during the Class Period ("Committee").

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3.    The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees," infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[3] As will be discussed in more detail below, the Class Period is defined as February 22, 2016 through the date of judgment ("Class Period").

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.      Because cost-conscious management is fundamental to prudence in the investment function the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

9.      At all times during the Class Period, the Plan had at least $1.2 billion dollars in assets under management.  At the Plan's fiscal year end in 2020 and 2019, the Plan had over $3.1 billion dollars and $2 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the Centene Management Corporation Retirement Plan ("2020 Auditor Report") at 3.

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

10.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) failing to control the Plan's recordkeeping and administration costs.

12.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## IV.   JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.  PARTIES

### Plaintiffs

17.     Plaintiff, Ruth Williams ("Williams"), resides in Akron, Ohio. During her employment, Plaintiff Williams participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below. Plaintiff Williams suffered injury to her Plan account by overpaying for her share of administration and recordkeeping costs through the Plan's poorly negotiated recordkeeping contract with Fidelity, as discussed in more detail below. In addition, Plaintiff Williams suffered losses to her Plan account by having to pay for her share of the excessive consulting fees paid by the Plan which were used to maintain the expensive and poorly maintained funds in the Plan as discussed below.

18.     Plaintiff, Tovah Allen ("Allen") resides in Apopka, Florida. During her employment, Plaintiff Allen participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below. Plaintiff Allen suffered injury to her Plan account by overpaying for her share of administration and recordkeeping costs through the Plan's poorly negotiated recordkeeping contract with Fidelity, as discussed in more detail below. In addition, Plaintiff Allen suffered losses

5

to her Plan account by having to pay for her share of the excessive consulting fees paid by the Plan which were used to maintain the expensive and poorly maintained funds in the Plan as discussed below.

19.    Plaintiff, Carolyn Ross ("Ross") resides in Riverview, Florida. During her employment, Plaintiff Ross participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.  Plaintiff Ross suffered injury to her Plan account by overpaying for her share of administration and recordkeeping costs through the Plan's poorly negotiated recordkeeping contract with Fidelity, as discussed in more detail below. In addition, Plaintiff Ross suffered losses to her Plan account by having to pay for her share of the excessive consulting fees paid by the Plan which were used to maintain the expensive and poorly maintained funds in the Plan as discussed below.

20.    Plaintiff, Alicia Bates ("Bates") resides in Rochester, New York. During her employment, Plaintiff Bates participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.  Plaintiff Bates suffered injury to her Plan account by overpaying for her share of administration and recordkeeping costs through the Plan's poorly negotiated recordkeeping contract with Fidelity, as discussed in more detail below. In addition, Plaintiff Bates suffered losses to her Plan account by having to pay for her share of the excessive consulting fees paid by the Plan which were used to maintain the expensive and poorly maintained funds in the Plan as discussed below.

21.    Plaintiff, Tracy Young ("Young") resides in Akron, Ohio. During her employment, Plaintiff Young participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below. Plaintiff Young suffered injury to her Plan account by overpaying for her share of administration

6

and recordkeeping costs through the Plan's poorly negotiated recordkeeping contract with Fidelity, as discussed in more detail below. In addition, Plaintiff Young suffered losses to her Plan account by having to pay for her share of the excessive consulting fees paid by the Plan which were used to maintain the expensive and poorly maintained funds in the Plan as discussed below.

22.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, total plan recordkeeping and administration cost comparisons to similarly-sized plans or information regarding other available funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

24.     Centene is the Plan sponsor and a named fiduciary with a principal place of business being 7700 Forsyth Boulevard, St. Louis, Missouri. The December 31, 2020 Form 5500 of the Centene Management Corporation Retirement Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. Centene describes itself as providing "fully integrated, high-quality, and cost-effective services to government-sponsored and commercial healthcare programs, focusing on under-insured and uninsured individuals." The December 31, 2021 Form 10-K of the Centene Corporation filed with the United States Securities and Exchange Commission ("2021 10-K") at 1.

25.     Centene appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. The Employee Benefits Investment Policy Statement of the Centene Management Corporation Retirement Plan, updated August 17, 2016 ("IPS") at 2-3. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26.     Accordingly, Centene during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

27.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

28.     Centene appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. IPS at 2-3. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

30.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

31.    A discussed above, Centene appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. IPS at 2-3.

32.    As stated in the IPS, the Committee is responsible for "selecting investment options … monitoring the performance of individual investment options … adding or removing investment options …" IPS at 3. Further the Committee must "[r]eview Plan and fund expenses at least annually." *Id.* As will be discussed below, the Committee fell well short of these goals as a fiduciary to plan participants.

33.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

34.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

35.    To the extent that there are additional officers, employees and/or contractors of Centene who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants

21-30 include, but are not limited to, Centene officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between February 22, 2016 through the date of judgment (the "Class Period").

37.    The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 63,066 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

38.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.    Whether Defendants are/were fiduciaries of the Plan;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

      B.      Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

      C.      Whether the Company and Partnership Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

      D.      The proper form of equitable and injunctive relief; and

      E.      The proper measure of monetary relief.

40.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.   THE PLAN

43.     The Plan is a defined contribution plan covering substantially all eligible employees of Centene. 2020 Auditor Report at 5. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. 2020 Auditor Report at 6. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

*Eligibility*

44.     In general, the Plan covers all employees of the Centene who are age 21 or older. 2020 Auditor Report at 5.

*Contributions*

45.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2020 Auditor Report at 5.

46.     With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id*. With regard to matching contributions made by Centene, Centene does provide a contribution of a portion of eligible compensation. *Id.* As detailed in the 2020 Auditor Report: "[t]he Company will contribute on a pay period by pay period basis to the Plan an amount equal to 50 percent of the first 6% of the compensation that a participant contributes to the Plan." *Id.*

47.     Like other companies that sponsor 401(k) plans for their employees, Centene enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

48.     Centene also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

49.     Given the size of the Plan, Centene likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

50.     With regard to contributions made by participants to the Plan, such contributions vest immediately. 2020 Auditor Report at 6. Generally, contributions made by Centene are subject to a five-year vesting schedule. *Id.*

*The Plan's Investments*

51.     In theory, the Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance and reviews total plan and fund costs each year. IPS at 3. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

52.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

53.     The Plan's assets under management for all funds as of December 31, 2020 was $3,185,426,362.  2020 Auditor Report at 4.

*Payment of Plan Expenses*

54.     During the Class Period, administrative and recordkeeping expenses were generally paid using a combination of charges to the participants and Plan assets. 2020 Auditor Report at 8.

## VIII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.  **The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

55.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

56.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

57.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

58.     In fact, in an attempt to discover the details of the Plan's mismanagement, on October 11, 2021, Plaintiffs wrote to Centene requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated November 11, 2021, Centene did not acknowledge whether

it kept Committee meeting minutes and, more importantly, did not provide any minutes in response to Plaintiffs' request.

59.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

60.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

61.     For example, Defendants did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than comparable funds found in similarly sized plans (conservatively, plans having over 1 billion dollars in assets).

62.     With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

63.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

64.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

65.     Here, Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

66.      Eleven of the Plan's funds, having more than $378 million dollars in assets under management in 2020, provide an example of imprudently selected funds. The expense ratio for one of these funds during the Class Period was *333%* above the ICI Median (in the case of UBS US Small Cap Growth P) and in another case the expense ratio was *270%* above the ICI Median (in the case of Northern Small Cap Value) in the same category.  The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the charts below:

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median** |
| Fidelity Total Bond Fund | 0.45 % | Domestic Bond | 0.39% |
| T. Rowe Price Blue Chip Growth I | 0.56 % | Domestic Equity | 0.30% |
| American Beacon Large Cap Value R5 | 0.63 % | Domestic Equity | 0.30% |
| Janus Henderson Enterprise N | 0.66 % | Domestic Equity | 0.30% |
| MFS Mid Cap Value R6 | 0.68 % | Domestic Equity | 0.30% |
| Ariel Fund Institutional | 0.72 % | Domestic Equity | 0.30% |

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median** |
| Fidelity International Discovery K | 0.91 % | International Equity | 0.50% |
| Cohen & Steers Realty Shares L | 0.96 % | Domestic Equity | 0.30% |
| Invesco Developing Markets R5 | 1.05 % | International Equity | 0.50% |
| Northern Small Cap Value | 1.11 % | Domestic Equity | 0.30% |
| UBS US Small Cap Growth P | 1.30 % | Domestic Equity | 0.30% |

67.    The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| Fidelity Total Bond Fund | 0.45 % | Domestic Bond | 0.29% |
| T. Rowe Price Blue Chip Growth I | 0.56 % | Domestic Equity | 0.34% |
| American Beacon Large Cap Value R5 | 0.63 % | Domestic Equity | 0.34% |
| Janus Henderson Enterprise N | 0.66 % | Domestic Equity | 0.34% |
| MFS Mid Cap Value R6 | 0.68 % | Domestic Equity | 0.34% |
| Ariel Fund Institutional | 0.72 % | Domestic Equity | 0.34% |
| Fidelity International Discovery K | 0.91 % | International Equity | 0.49% |
| Cohen & Steers Realty Shares L | 0.96 % | Domestic Equity | 0.34% |
| Invesco Developing Markets R5 | 1.05 % | International Equity | 0.49% |
| Northern Small Cap Value | 1.11 % | Domestic Equity | 0.34% |
| UBS US Small Cap Growth P | 1.30 % | Domestic Equity | 0.34% |

68.    It is unlikely the Defendants engaged in a prudent process from 2016 through 2020 since the Plan contained at least nine funds that had excessive expense ratios when compared to their peers from 2016 to 2020.  Not only were the expense ratios of these nine funds high but their performance also lagged well behind their peers.

69.    For example, the Northern Small Cap Value Fund performed worse than 87% of its 421 peers at the 3-year mark and performed worse than 83% of its 416 peers at the 5-year mark.

70.    Defendants' failure to obtain reasonably-priced and properly performing investments from 2016 to 2020 is circumstantial evidence of their imprudent process to review and control the Plan's costs and is indicative of Defendants' breaches of their fiduciary duties, relating to their overall decision-making, which resulted in the payment of excessive recordkeeping and administration fees – the crux of this lawsuit - that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### (B)    The Plan's Total Plan Costs Were Much Higher than Those of Its Peers

71.    "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst working through its related analytical arm the Investment Company Institute ("ICI") "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios."[7]

72.    Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return."  Vanguard's Principles for Investing Success, at 17.[8]

73.    The ICI conducted a study in 2018 (*see* fn. 6) which calculated the average total plan costs from hundreds of 401(k) Plans ranging in size from the smallest plans having less than 1 million dollars in assets all the way up the nation's largest plans with assets under management of more than 1 billion dollars.  Looking at plans that have over 1 billion dollars, the ICI determined that the average asset weighted total plan cost or TPC for 401(k) Plans with over 1 billion dollars in assets under management is .22% of total plan assets.

---

[7] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2018* at 55 (July 2021) (hereafter, "ICI Study") available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

[8] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

74.    Here, another indication that the Plan was poorly run and lacked a prudent process for selecting and monitoring the Plan's investments is that it had a TPC of more than .46%, or, in other words, more than 109% higher than the average.

**(C)    The Plan's Recordkeeping and Administrative Costs Were Excessive During The Class Period**

75.    Another clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

76.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

77.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.    Recordkeeping;

B.    Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C.    Administrative services related to converting a plan from one recordkeeper to another;

D.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E.  Maintenance of an employer stock fund (if needed);

F.  Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G.  Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H.  Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[9] (excluding the separate fee charged by an independent third-party auditor);

I.  Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

78.    This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

79.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant

---

[9]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

      A.  Loan processing;

      B.  Brokerage services/account maintenance (if offered by the plan);

      C.  Distribution services; and

      D.  Processing of qualified domestic relations orders.

80.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.  That is exactly the case here where on May 1, 2017, Centene executed an Investment Management Agreement with Strategic Advisers, Inc., ("SAI") to run the Plan's managed account service.   Both SAI and Fidelity Management Trust Company ("FMTC" or Fidelity for short), the Plans' recordkeeper, are wholly-owned subsidiaries of FMR, LLC (the parent company).

81.    Here, Fidelity provided services in line with the routine bundled and A La Carte service categories described above.  The RKA services performed each year during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example.  The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 37, 60, 64 and 65.  Below are the typical codes associated with recordkeeping including those reported by Centene:

            37 – Participant loan processing

            60 – Sub-transfer agency fees

            64 – Recordkeeping fees

65 -- Account maintenance fees

82.    *See* Instructions for the 2020 Schedule C (Form 5500) *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. Again, the above services are not out of the ordinary of the services other national recordkeepers provide. And as noted earlier participant loan processing is a service that can be provided for next to nothing.

83.    The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

84.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

85.    During the Class Period, many of the Plan's funds paid revenue sharing to the Plan's recordkeeper. Looking at 2020 as a representative sample of the entire Class Period, revenue sharing was paid to Fidelity as follows:

| 2020 | 2020 Assets | RS% | Amount |
|---|---|---|---|
| Fidelity Total Bond | $75,503,135.00 | 0.20% | $151,006.27 |
| Fidelity International Discovery K | $57,059,607.00 | 0.20% | $114,119.21 |
| UBS U.S. Small Cap Growth | $35,619,790.00 | 0.15% | $53,429.69 |
| American Beacon Large Cap Value Institutional | $23,498,337.00 | 0.04% | $9,399.33 |
| Invesco Developing Markets R5 | $19,780,209.00 | 0.35% | $69,230.73 |
| Cohen & Steer Realty | $15,362,207.00 | 0.40% | $61,448.83 |
| Ariel Fund Institutional | $7,469,833.00 | 0.10% | $7,469.83 |

| 2020 | 2020 Assets | RS% | Amount |
|---|---|---|---|
| Northern Small Cap Value | $6,047,766.00 | 0.40% | $24,191.06 |
|  |  | **Total:** | **$490,294.96** |

86.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

87.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

88.     In this matter, using revenue sharing or a combination of revenue sharing and a flat fee to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

89.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if

recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

90.     Because Fidelity has been the Plan's recordkeeper since at least March 2015, and the Plan paid yearly amounts in recordkeeping fees that were well above industry standards each year over the Class Period, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

91.     Looking at all the years during the Class Period, it's clear these unreasonably high recordkeeping costs continued throughout the Class Period. As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were significantly above market rates when benchmarked against similar plans.

|  | Participants | RK Direct | RK Indirect[10] | Total Comp | $PP |
|---|---|---|---|---|---|
| 2016 | 20,162 | $317,573.00 | $509,826.00 | $827,399.00 | $41.04 |

---

[10] Indirect costs are estimated but are likely conservative. Discovery may reveal additional sources of revenue sharing which will drive the per participant costs even higher. The indirect costs reported are derived from the Form 5500s and known revenue sharing amounts for specific funds in the Plan. Added to this are any amounts reported on Schedule C as indirect costs and which bear common recordkeeping coding which include, but, are not limited to, codes 15, 37, 60, 64 and 65. These codes refer to recordkeeping and administrative costs, as discussed above. Although, some of this amount may have been paid back to the Plan as a rebate, it's not clear exactly how much and how and when it was applied. Also, even though there was a contracted for recordkeeping only amount of $33 per participant for most of the Class Period, as discussed herein, the total administrative and recordkeeping costs were still excessive even if a revenue credit of $160,000 per year was applied as indicated by the Plan documents.

| | Participants | RK Direct | RK Indirect[10] | Total Comp | $PP |
|---|---|---|---|---|---|
| 2017 | 32,590 | $1,238,352.00 | $1,336,161.00 | $2,574,513.00 | $79.00 |
| 2018 | 41,412 | $1,710,328.00 | $268,626.00 | $1,978,954.00 | $47.79 |
| 2019 | 45,534 | $1,967,832.00 | $337,726.00 | $2,305,558.00 | $50.63 |
| 2020 | 63,066 | $2,165,183.00 | $490,294.00 | $2,655,477.00 | $42.11 |

92.     The devastating effect of unchecked recordkeeping and administration fees is seen clearly here. As detailed above, the per participant charge ranged from a high of $79 per participant in 2017 to a low of $42 per participant in 2020. A prudent fiduciary would have understood these fees to be excessive and taken corrective action by seeking lower cost administrative and recordkeeping alternatives.

93.     By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

94.     At all times during the Class Period, the Plan had over 20,000 participants and over $1.2 billion dollars in assets under management. As of 2020, the Plan had over 63,000 participants and over $3.1 billion dollars in assets under management making it eligible for some of the lowest fees on the market.

95.     The recordkeeper throughout the Class Period was Fidelity as noted above. Let's start with what Fidelity itself would pay if it were in Defendants' shoes.  In a recent lawsuit where Fidelity's multi-billion dollar plan with over 58,000 participants was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

96.     Specifically, Fidelity stipulated as follows:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that *Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year*. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

97.     The key here is that Fidelity served as the Plan's recordkeeper during the same time period when Fidelity admitted its own plan didn't offer services broader or more valuable than any of the plans it served.  Accordingly, the Centene Plan fiduciaries could have negotiated for recordkeeping and administration fees as low as $14 beginning in January 2017 when the Centene Plan had 32,590 Plan participants with account balances and certainly could have garnered the $14 per participant fee by 2020 when the Centene Plan's participants exceeded the number of the Fidelity Plan's participants.  Given Fidelity's admission, the Centene Plan fiduciaries should not have been paying more than $21 per participant in recordkeeping and administration fees.

98.     This is especially true for two additional reasons.  First, Fidelity derived benefit from the Plan's managed account service through SAI.  Second, the Plan offered several Fidelity mutual funds in its menu, a factor which should have led to further discounting of the recordkeeping and administration costs.

99.     Beyond the admissions by Fidelity itself that Centene could have obtained far lower recordkeeping costs, looking at recordkeeping costs for other plans of a similar size in 2018 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees. 2018 is used here as an example year since the Defendants should have been able to obtain similar results for all the years throughout the Class Period. The chart below analyzes

a few well managed plans having more than 17,000 participants and more than $300 million dollars in assets under management:

| Plan Name | Number of Participants | Assets Under Management | R&A Costs on Per-Participant Basis[11] | Record-keeper |
|---|---|---|---|---|
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | **$30** | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | **$26** | Great-West |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | **$25** | Great-West |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | **$23** | T.Rowe |
| Danaher Corporation & Subsidiaries Savings Plan | 35,757 | $4,565,702,706 | **$28** | Fidelity |
| Deseret 401(k) Plan | 34,357 | $3,381,868,127 | **$25** | Great-West |
| Publicis Benefits Connection 401K Plan | 42,316 | $2,547,763,175 | **$28** | Fidelity |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,103,524321 | **$27** | Vanguard |

In the examples above, a rate of $30 per participant is the outlier. Thus, the Plan, with over 45,534 participants and over $2 billion dollars in assets in 2019, should have been able to negotiate at

---

[11] In order to keep this comparator analysis consistent with the Centene analysis above, R&A costs in the chart are derived, in the same manner as for Centene, from Schedule C of the Form 5500s and reflect fees paid to service providers with service codes that signify recordkeeping, codes such as "15," "37," "60," "64" and/or "65," are some examples, but are not limited to, these codes. *See* Instructions for Form 5500 (2020) at pg. 27 (defining each service code), https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

worst, recordkeeping cost in the low $20 range from the beginning of the Class Period to the present.

100.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost. Failure to do so resulted in millions of dollars of damages to the Plan and its participants.

**(4)    Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style**

101.    The Plan failed to replace several of the higher cost and underperforming funds which in 2020 housed over $320 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. As detailed in a well-respected investment journal: "[a]n actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money."[12] Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved.

102.    Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or sooner. Failure to do so cost the Plan and its participants millions of dollars in lost opportunity and revenue.

103.    There were, at least, hundreds of superior performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan.

---

[12] https://www.thebalance.com/actively-vs-passively-managed-funds-453773 last accessed on November 12, 2020.

104.    The chart below choses one of these superior performing alternatives out of the hundreds available for each fund and compares them to the underperforming funds currently in the Plan:

| Current Fund | Current ER | LFA | LFA ER |
|---|---|---|---|
| Fidelity Total Bond Fund | 0.45 % | John Hancock Bond R6 | 0.37 % |
| T. Rowe Price Blue Chip Growth I | 0.56 % | Vanguard U.S. Growth Fund Admiral | 0.28 % |
| American Beacon Large Cap Value R5 | 0.63 % | Vanguard Windsor Fund Admiral Shares | 0.19 % |
| Janus Henderson Enterprise N | 0.66 % | Bridge Builder Small/MidCap Growth | 0.38 % |
| MFS Mid Cap Value R6 | 0.68 % | Fidelity Value K | 0.47 % |
| Fidelity International Discovery K | 0.91 % | Vanguard international Growth Admiral | 0.33 % |
| Invesco Developing Markets R5 | 1.05 % | American Funds New World R6 | 0.59 % |
| Northern Small Cap Value | 1.11 % | DFA US Targeted Value I | 0.33 % |

105.    Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but the suggested alternative funds outperformed all of the funds significantly. The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years.  The underperformance of these funds as compared to the suggested alternatives increases these damages exponentially. The underperformance of these funds is represented in the chart below:

| Current | Benchmark[13] | Alternative Fund | Benchmark Relative | |
|---|---|---|---|---|
| | | | 3Y | 5Y |
| Fidelity Total Bond Fund | iShares Core U.S. Aggregate Bond ETF | John Hancock Bond R6 | 1.10% | 1.34% |

[13] Benchmark funds are chosen from funds that meet two criteria. First, the benchmark must be similar to the fund in the Plan in that a returns-based correlation between the fund in the Plan and all other funds in the third party administrator ("TPA") universe calculated as a standard Pearson

| Current | Benchmark[13] | Alternative Fund | Benchmark Relative | |
|---|---|---|---|---|
| | | | 3Y | 5Y |
| | | | 1.33% | 1.65% |
| | | | | |
| T. Rowe Price Blue Chip Growth I | iShares Russell 1000 Growth ETF | | -3.09% | 0.81% |
| | | Vanguard U.S. Growth Fund Admiral | 4.15% | 2.91% |
| | | | | |
| American Beacon Large Cap Value R5 | iShares Russell 1000 Value ETF | | 0.37% | 2.10% |
| | | Vanguard Windsor Fund Admiral Shares | 1.69% | 3.02% |
| | | | | |
| Janus Henderson Enterprise N | iShares Russell Mid-Cap Growth ETF | | -3.79% | -1.22% |
| | | Bridge Builder Small/MidCap Growth | -1.49% | -0.12% |
| | | | | |
| MFS Mid Cap Value R6 | iShares Russell Mid-Cap Value ETF | Fidelity Value K | 1.26% | 0.90% |

product-moment correlation coefficient. Secondly, benchmark funds are compared to the latest positions reported on filings made to the SEC, when available. Using these positions, a holdings-based correlation using the funds' positions and multi-factor risk model based on Arbitrate Pricing Theory and an advance extension of Modern Portfolio Theory. Quantitative similarity is determined as the average correlation between returns-based and holdings-based correlations. The alternative funds have historical correlation of greater than .90 with the corresponding fund in the plan.

| Current | Benchmark[13] | Alternative Fund | Benchmark Relative | |
|---|---|---|---|---|
| | | | 3Y | 5Y |
| | | | 3.56% | 2.82% |
| | | | | |
| Fidelity International Discovery K | iShares MSCI EAFE Growth ETF | Vanguard international Growth Admiral | 0.32'% | 0.90% |
| | | | 10.94% | 11.56% |
| | | | | |
| Invesco Developing Markets R5 | iShares MSCI Emerging Markets ETF | American Funds New World R6 | 3.55% | -0.84% |
| | | | 6.20% | 3.92% |
| | | | | |
| Northern Small Cap Value | iShares Russell 2000 Value ETF | DFA US Targeted Value I | -3.59% | -3.63% |
| | | | -0.01% | -0.34% |

106.    Because a fiduciary must have the best interests of participants in mind, performance is defined, not just on an actual return basis, but quantified on an absolute and relative volatility basis which considers returns on a risk adjusted basis.  Fiduciaries utilize Modern Portfolio Theory or a nearly identical methodology (MPT) to make such assessments and the Committee utterly failed to select prudent investments for the Plan based on several criteria under the MPT.

107.    Modern trust law and those who have a legal fiduciary duty to choose and review investments on behalf of others, apply the tools of Modern Portfolio Theory or a nearly identical methodology in evaluating a trustee's or fiduciary's investment choices and overall strategy. UPIA § 2(b) (Unif. Law Comm'n 1995); Restatement (Third) of Trusts § 90(a) (2007) ("This standard

requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust."). *See Birse v. CenturyLink, Inc.*, 2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

108.    Had MPT theory or a nearly identical methodology been properly utilized these funds would not have been selected. The goal of MPT theory is to select funds that are among the best in their class, and, accordingly, one would expect to see a fund with the lowest possible expense ratio available and which performed in the upper tier of its class. Even if the Defendants relied on the added excessive expensive ratios to pay for administrative and recordkeeping fees, a prudent fiduciary utilizing MPT appropriately would have to negotiate the lowest possible administrative and recordkeeping costs available and charged only those costs, and nothing more, directly to participants or the Plan.  But Defendants didn't even get close to that standard as the above allegations demonstrate that fees for the challenged funds were sometimes triple available alternative funds.

109.    What's worse, maintaining these funds in the Plan cost all participants lost savings opportunity not just those that had invested in these funds. Continuing to monitor and maintain these underperforming funds cost the Plan more in advisory services to purportedly assist the Defendants in monitoring the performance and expense of these funds. Instead, the better practice would have been to maintain funds in the Plan that paid no more expense than reasonable and simply performed better. Doing so, would have removed the need for much of the advisory fees paid during the Class Period and would have kept those expenses in participants savings accounts which would have compounded over time. In 2020, advisory fees totaled $404,744. 2020 Form 5500 at 3.

110.    A prudent fiduciary should have been aware of these better preforming lower cost alternatives and switched to them at the beginning of the Class Period.  Failure to do so is a clear

indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Committee)

111.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

112.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

113.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

114.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to make decisions regarding the Plan's recordkeeping and administration fees.

115.    The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with excessive Plan recordkeeping and administration costs.

116.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

117.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

118.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Centene and the Board Defendants)

119.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

120.    Centene and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

121.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

122.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on

which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

123.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan and pay exorbitant fees for the Plan's recordkeeping and administration, all to the detriment of the Plan and Plan participants' retirement savings.

124.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

125.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated:  May 20, 2022                          **STEELMAN GAUNT CROWLEY**

                                              */s/ Stephen F. Gaunt*
                                              Stephen F. Gaunt
                                              MO Attorney ID: 33183MO
                                              901 Pine Street, Suite 110
                                              Rolla, MO 65401
                                              sgaunt@steelmanandgaunt.com
                                              (573) 341-8336
                                              Fax: (573) 341-8548

                                              **CAPOZZI ADLER, P.C.**

                                              */s/ Donald R. Reavey*
                                              Donald R. Reavey, Esquire
                                              (*Admitted Pro Hac Vice*)
                                              PA Attorney ID #82498
                                              2933 North Front Street
                                              Harrisburg, PA 17110
                                              donr@capozziadler.com
                                              (717) 233-4101
                                              Fax: (717) 233-4103

                                              */s/ Mark K. Gyandoh*
                                              Mark K. Gyandoh, Esquire
                                              (*Admitted Pro Hac Vice*)
                                              PA Attorney ID # 88587
                                              Gabrielle P. Kelerchian
                                              (*Admitted Pro Hac Vice*)

PA Attorney ID # 324248
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax: (717) 233-4103

Counsel for Plaintiffs and the Putative Class

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2022, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:  /s/ *Donald R. Reavey*
Donald R. Reavey, Esq.